**CONSOLIDATED UNDERWRITERS,**
Appellant,

v.

**Jack LAMPKIN, Appellee.**

No. 6251.

Court of Civil Appeals of Texas.

Beaumont.

March 12, 1959.

Rehearing Denied April 15, 1959.

W. C. McClain, Conroe, for appellant.

Jim S. Phelps, Houston, for appellee.

McNEILL, Justice.

This is a workmen's compensation case and the appeal involves two questions, first, whether the employee under Sec. 6a of Article 8307, Vernon's Annotated Civil Statutes, or at common law, effectively elected to proceed against the third party to recover damages instead of against the subscriber's insurance carrier, and, second, whether claimant was an employee of the J. H. Williams Lumber Company, the subscriber under the policy of insurance with appellant, or whether claimant, the appellee, was an employee of one Earnest Williams.

About the middle of 1954 J. H. Williams, who had been operating a sawmill in Arkansas, moved to Conroe and bought a sawmill. At the time involved, the J. H. Williams Lumber Company was a partnership composed of J. H. Williams, his daughter, Marjorie Williams Vaughan, and another. At first J. H. Williams engaged one W. Johnson, a white man, as a logging contractor to purchase and furnish logs for the sawmill. However, in August J. H. Williams 'phoned Earnest Williams, a colored man who lived at Waldo, Arkansas, and who had formerly cut timber for him, to come to Conroe where he could give him

work. Earnest Williams promptly came to Conroe and called on J. H. Williams who advised him that temporarily he could get some work with W. Johnson, the logging contractor for J. H. Williams Lumber Company. Earnest worked for Johnson a few days and at the end of which time the lumber company severed its connection with Johnson and made a different arrangement for its supply of timber. About that time J. H. Williams located and bought a tract of timber in the west end of Montgomery County. He then told Earnest to get some men to help cut timber and come to the sawmill the next day, which was Monday, and that they would make arrangements for cutting the timber.

There is disagreement in the testimony as to what arrangement or agreement was made between J. H. Williams for the lumber company and the colored man, Earnest Williams. The following is appellee's evidence on the point. Earnest Williams, who testified by deposition for appellee, stated that J. H. Williams told him that he ought to get five good saws (meaning five pairs of men). This would produce enough timber for the mill's operations. He also told Earnest that he should get good men, in fact J. H. Williams picked the men out, naming Jack Lampkin, appellee, as one, and others; that he would pay $5.50 per thousand for the timber cut and furnish a truck to transport the men back and forth to the woods; that this would give Earnest $1 per thousand and each pair of the men would get $4.50 per thousand; Earnest Williams stated that he hired Jack Lampkin when Mr. J. H. Williams told him to. After making the arrangements for payment of the men and furnishing the truck, Earnest Williams took the truck with some of the men in it and J. H. Williams took the others in his car, and carried them to the tract of timber to be cut, which was some 35 miles away. The testimony of Earnest Williams was that when he got to this tract of timber he started filing saws and Mr. J. H. Williams took the men on farther into the woods and showed them the timber to cut.

Mr. Williams explained that he wanted 18 and 20 foot logs and to cut all timber 10 inches in diameter and one foot above the ground. He had the men arrange to do the cutting in "strips". He put the number of pairs of men on pieces of paper and had them draw and each pair would have a "strip" or width of the woods to cut. Both Earnest Williams and Jack Lampkin, appellee, testified that J. H. Williams instructed the men as to the timber to be cut and the method of doing so. After explaining this to them he left and came back in a couple of days to check their work and see if they were cutting the timber properly. He found that a tree had been left in appellee's "strip" and he instructed Earnest Williams to have appellee cut the tree down. Earnest Williams testified further that J. H. Williams could come out into the woods and give any and all orders to the men he desired to. He stated that they returned to the mill about 4 p. m., on the first afternoon and Mr. J. H. Williams told him they were getting in too early and that if the men did not want to work early and late to let them go and get others; that he, Earnest Williams, was the "straw boss" and that Mr. Williams had the right to tell him or any of the men what to do and had the right to tell him how and when to use the truck. The furnishing of the truck by Mr. Williams to Earnest was a temporary arrangement as it was contemplated that Mr. Williams would find a truck for Earnest Williams to buy a short while later. This temporary arrangement was never changed for the reason that the accident, the outgrowth of this suit, took place on the second Saturday after the arrangements were made.

Earnest Williams testified that J. H. Williams was to pay for social security on the men and workmen's compensation insurance for them and he was also to furnish the gasoline, oil and repairs for the truck. Earnest testified that when he came to Conroe he and the other men who were with him were broke and that he had to get $20 from Mr. Williams temporarily to

buy food for himself and to give the other men money for their needs; that he could not figure up the amount of timber cut but could keep the scale.

Jack Lampkin, appellee, testified that Mr. Williams pointed out the lines of the tract of land to be cut and explained how the timber was to be cut and instructed them to cut in "strips" as testified to by Earnest Williams. He stated that he owned his own ax but that Earnest furnished saws to them.

Appellant's evidence was as follows: Anthony Herring, one of the timber cutting crewmen, testified that Earnest Williams gave all instructions and orders as to what to do in regard to cutting the timber.

Mrs. Marjorie Williams Vaughan, daughter of J. H. Williams and a partner in the sawmill, testified that she was bookkeeper for the company during the time involved, and that Earnest Williams furnished her the social security numbers of the men working for him in the woods and the scale of the timber cut each day; that she was merely keeping the books for Earnest Williams until his wife could come, evidently from Arkansas, to take over this work and that Earnest could hardly write. She further testified that neither Earnest nor any of the men under him were carried as employes of the lumber company and no social security nor withholding taxes were held out or reported by the company on these men; that no payments were made to the men direct for any work but were made to Earnest.

J. H. Williams testified that the agreement with Earnest Williams was that he was to be paid $6 per thousand feet and Earnest was to furnish his transportation and pay social security and withholding taxes and workmen's compensation insurance on his men. However, Earnest was unable to furnish a truck so he let him use the lumber company truck and charged him 50 cents per thousand for the use of it. He stated that he had no agreement as to the number of men that Earnest Williams was to put on the job, but did expect him to keep enough logs coming in to keep the mill busy. Mr. Williams was to furnish oil and gas and make repairs for the truck. He stated that he showed Earnest where the tract of timber was, but Earnest put the men to work and arranged for the strips or area each pair of men were to cut and he had nothing to do with that. He stated he spent a short while out in the woods on the Monday morning involved and did not go back out there until about two or three days later when he went to check to see if the boys were properly cutting timber and to see if the timber was cut according to specifications. He said that he never told Earnest what hours to work, did not know what hours they worked and never paid the individual men any money. He denied suggesting the names of any employes to Earnest or that he ever attempted to exercise any control over them.

Fred Calvin Cole testified that he was a member of the working crew and that J. H. Williams never told them what or how to cut any timber and that Earnest gave them all of the instructions and nobody ever told him what hours to work, that he just quit when he had "had enough".

Appellant also offered in evidence the payrolls of the lumber company and quarterly social security and withholding taxes forms, none of which carried the names of Earnest Williams or any of his crew. The men were paid on Friday afternoons. On the first Friday afternoon when they got into the mill the necessary figures were given by Earnest Williams to the bookkeeper who made out the check to Earnest Williams for $353.03, which was based on' $5.50 per thousand, and she cashed the check for Williams, giving him the money and he paid each pair of men the amount due them. On the second Friday the men came in as usual, but since Mr. J. H. Williams was out of town nobody could sign a check to pay them so they went back to work Saturday morning and were coming

in in the early afternoon in the truck when a collision took place between the truck and an Oldsmobile automobile. As a result of this collision appellee was severly injured and this action is the outgrowth thereof.

The suit was originally filed in the district court at Conroe and was removed by appellant to the Federal Court of Houston on the ground of diversity of citizenship. The cause was tried in the Federal Court, and claimant was denied recovery, the court holding that Earnest Williams was an independent contractor, and that appellee was working for him. Motion for new trial was filed by appellee and since more than one and one-half years had then expired since the injury, appellee filed a common-law action for damages in a district court of Harris County against Earnest Williams as appellee's employer, J. H. Williams as owner of the truck on the theory of negligent entrustment of the truck, and against a third party, one Pruitt, who was driving the Oldsmobile causing the collision. The defendants were served in this cause, and J. H. Williams filed a plea of privilege and the cause as to him was transferred to Montgomery County. Defendant Pruitt not having answered an interlocutory default judgment was rendered against him, but no proof of any damages were made. Shortly thereafter appellee's attorney discovered that appellant, Consolidated Underwriters, was not, as alleged in the sworn petition for removal to Federal Court, a corporation existing under the laws of Missouri and he promptly filed a motion to remand the cause to the State Court, alleging in his motion that he had accepted the allegations of appellant as true and not until immediately before his motion was filed did he discover that these allegations of diversity of citizenship were false. In addition to his motion and brief in its support in the Federal Court, appellee cited several instances of the Federal Courts remanding actions brought to the Federal Court by appellant on a similar basis. The Federal Court remanded this cause and when it was returned to the State district court, appellee filed a motion to consolidate the suit with his cause of action against the defendant J. H. Williams that had been transferred to Montgomery County on plea of privilege. This motion was granted. Shortly thereafter appellant filed motion for summary judgment in this cause, asserting that since appellee had filed his common-law damage suit in Harris County seeking to recover damages against the third party, the owner of the Oldsmobile, and had prosecuted his suit to an interlocutory default judgment, he had effectively elected his remedy precluding further prosecution of this workmen's compensation suit, and in addition appellant urged plea in bar or abatement to the same effect. Appellee filed a reply to these pleadings, asserting that there was no election, and if it would otherwise be, appellant is estopped to assert same on account of its misrepresentation and fraud in asserting under oath that defendant was a foreign corporation, thereby obtaining removal of the action to Federal Court, and causing appellee to be misled thereby. The trial court sustained appellee's contention; and the cause then proceeded to trial before a jury and the jury finding that appellee was totally and permanently disabled and that Earnest Williams was not an independent contractor, the trial court rendered judgment for appellee.

Appellant says in point VI the finding of the jury that Earnest Williams was not an independent contractor has no support in the evidence, in point VII that the evidence was insufficient to raise the issue, and in point VIII that the great weight and preponderance of the evidence is against this finding.

■ The test to be applied on the issue whether a person is an employee or independent contractor is, who has the right to control the manner, means and details of the work. Southern Underwriters v. Samanie, Tex.Com.App., 137 Tex. 531, 155

S.W.2d 359. Accepting appellee's version of the testimony as we are required to do, it was shown that J. H. Williams employed a "broke" and illiterate Negro man to do the timber cutting. This man, Earnest Williams, at J. H. Williams' instruction, employed appellee, among others; J. H. Williams furnished transportation back and forth to work; he told Earnest he and his men were getting in too early, that if they didn't want to work longer hours to get other men; he set the men to work the first morning instructing not only the specifications of timber to be cut, but directing in detail the manner of cutting in "strips"; he was to pay social security tax and workmen's compensation insurance on the men; he could come out to the work site and give any orders he desired to the men. While J. H. Williams said that Earnest Williams was to hold out the social security and carry workmen's compensation insurance on the men, the former testified that to buy a workmen's compensation insurance policy on the men one would be required to pay two or three hundred dollars down. This he knew Earnest Williams could not do. He also testified that it would cost $18 per hundred in wages and that social security tax would run $2 per hundred. This, then, would cost somebody $20 per hundred of payroll. The first week's payroll was $353.03 of which Earnest Williams received $65.09. If he were required to pay social security and for compensation insurance, it is plain that his pay would substantially all be thus absorbed.

■ ■ In passing on the weight to be given the above testimony it should be borne in mind that, " * * * an employer has the right to exercise such control over an independent contractor as is necessary to secure the performance of the contract according to its terms, in order to accomplish the results contemplated by the parties in making the contract, without thereby creating such contractor an employee of such company." Industrial Indemnity Exchange v. Southard, 138 Tex. 531, 160 S. W.2d 905, 907. That J. H. Williams showed the men the timber to be cut and instructed them as to the specifications of the timber to be cut is no evidence that an employer-employee relationship existed. Yarbrough v. General Lloyds Fire & Cas., Tex.Civ.App., 259 S.W.2d 644. And neither was the need of the employer to see that sufficient quantity of logs were cut per week to keep his sawmill running. But disregarding these factors, the testimony as set out above is still sufficiently cogent to sustain the finding of the jury as against appellant's points of no evidence, insufficiency thereof, and against the great weight thereof. Southern Underwriters v. Samanie, supra; Highway Cas. Co. v. Reid, Tex.Civ.App., 311 S.W.2d 484; Wallace v. Southern Cotton Oil Co., 91 Tex. 18, 40 S.W. 399.

By its first two points appellant urges that appellee, in having instituted the third-party suit for damages in Harris County against Earnest Williams, alleging that he was the employer, against J. H. Williams for negligent entrustment of the truck to the other Williams, and against the driver of the Oldsmobile which collided with the truck and having taken interlocutory default judgment against said driver, and after this suit as to J. H. Williams was transferred to Montgomery County and appellee having obtained permission to consolidate it with his compensation action, that this under Sec. 6a, Art. 8307, was a binding election to proceed against the third party and appellee cannot further prosecute this compensation action. It appears that while permission was granted appellee to consolidate his workmen's compensation action with the action against J. H. Williams, this was not done, and at the beginning of the trial which resulted in the judgment now appealed from, appellee took a non-suit as to the action against J. H. Williams.

■ ■ Appellee asserts that said action against the third party was not an elec-

tion of remedies for the reason that since it appeared in all probability that he had lost the compensation suit in the U. S. District Court, and nearly two years had passed since the accident, it was necessary to file the third-party suit in order to protect whatever right, if any, he had left to recover for his injuries. Appellee in his brief on this point says: "Remember, when we filed the third-party suit, a Federal Court had already written an opinion saying we were wrong, and this Honorable Court knows, as a practical matter, it would have been almost impossible to reverse the Honorable Judge Allen B. Hannay on his findings of fact where he was the trier of said facts as well as the law. Judge Hannay had found, as a fact, that Earnest Williams was an independent contractor." We cannot say appellee was wrong in his assumption that his hope of recovery on his compensation suit had practically faded away after judgment against him in the Federal Court, and the only alternative was to institute the third-party action. There was no election to give up something that reasonably appeared at the time to be already lost. There must be two or more inconsistent remedies existing at the time of action taken by a party before it can be asserted that an election of remedies takes place. United States Fidelity & Guaranty Co. v. First National Bank in Dallas, Tex., 5 Cir., 172 F.2d 258; 15 Tex.Jur. Sec. 2, p. 820. From a practical standpoint this did not exist for appellee. The institution of the third-party action has brought no injury to appellant. It was promptly advised thereof by appellee and its subrogation rights have in nowise been impinged. There is no reason why it could not intervene in this action. Its intervention would not be subject to the bar of limitation statute. 28 Tex.Jur., Sec. 115, p. 209. The taking of an interlocutory judgment by default has no finality, as it is within control of the trial judge until all issues of the case are disposed of. Appellee states at the "time he was on the horns of a dilemma; he could refrain from filing his third-party suit in State court and run the risk of the statute of limitation catching him or file his suit and run the risk of having the filing of same called an election." The background for these horns were made by the incorrect affidavit of appellant (the present attorneys for appellant not then participating) in obtaining admittance by the diverse citizenship route to the U. S. District Court at Houston. Under the circumstances of the present case, we hold appellant estopped to urge election of remedies, either at common law or statutory, against appellee. Texas Employers' Ins. Ass'n v. Fish, Tex.Civ.App., 266 S.W.2d 435; 31 C.J.S. Estoppel § 59, pp. 236–239.

The judgment of the trial court is affirmed.